I'm Michael Kim. With me are two associates, Francesco Savoia and Adam Garcia. We represent Mrs. Jeon and her deceased husband, Mr. Kwok. The case below turned on a paragraph 17 of the Third Amendment complaint that really had nothing to do with the case itself. By operation of settled law out of the Ninth Circuit and everywhere else, when a final pretrial order is entered, that is the instrument that governs the conduct of the trial. The final pretrial order supplanted paragraph 17, and we discussed that on pages 38 and 39 of our opening brief, where we described, and the final pretrial order described, the incident that Mr. Kwok suffered was an underwater incident. The lower court fixated, after the close of our evidence, on a Rule 50 motion, where all the facts had to be construed in a way favorable to us, with all reasonable inferences given to us. The lower court fixated on a paragraph 17 that was litigated from the outset, and paragraph 17 itself was a disjunctive assertion of liability, not an admission of fact. I'd like to point you to the issue that is of concern to me in the case, and that is the question of causation, because ultimately Dr. Rossi's testimony was disallowed because of causation. So I have a couple of questions for you about that point. Do I understand correctly or not that it is your position that either a lifeguard or a video monitor would have been sufficient? Either a lifeguard or a video monitor or a pool attendant or somebody manning the deck. Let me follow up, because if it is your position, as I understand it to be, that a video monitor would have sufficed, then I have some difficulty seeing that there's evidence of causation. I understand how if a person is there, presumably your argument is they can pull them out immediately, which is what Dr. Rossi said immediately was his first formulation, but I did not see evidence of how long it would take a reasonable video monitor person to get from wherever they were monitoring the video to the pool, and whether that would have gotten them there any sooner than the two and a quarter minutes. And I may be missing something in the record, so is there evidence, and if so, point me to it, that it would have taken less than two and a quarter minutes to get from a reasonable video monitoring position to the pool? Judge Graber, our aquatics expert, Gerald Dworkin, testified very extensively on the issue of liability, and he discussed that somebody had to observe the pool under what he described as the 1020 rule under the ANSI standard that applies to all resorts with swimming pools. So whether it's a video monitor... What does the 1020 standard mean? That means every 10 to 20 seconds, you have to scan that area of the... So he was looking at the video monitor to the pool, physically to the pool. I believe that was testified by the hotel employees who described that they were... Dwayne Freeman was at the security desk in the lobby where he was serving as the concierge to the apartment residents. There was another patrolling security... So what did he say about how long it would take? My recollection is he didn't address it directly, but the two security guards essentially testified that when they discovered there was a problem, they dispatched the patrol security officer... Right. Is there a testimony as to how long that takes? He was there with under two minutes, and Rossi himself described that two minutes would be an important time limit for somebody to be submerged. Mr. Potts was submerged eight minutes. Actually, Dr. Rossi said that at one point, Dr. Rossi said within one minute may have been the time limit. That's correct. But to Judge Graber's point, it seems to me there's the transit time for the emergency response, but in this particular accident, which is a terribly unfortunate incident, of course, but at ER 1062, I think plaintiff's expert Dworkin said that he made the observation there wasn't any obvious sign of struggling or distress by the decedent. So it seems to me that if it's really a minute, according to Dr. Rossi, that it takes to get somebody out of the water, that's the amount of time you have to get them out of the water without potentially having neurologic injury, and there's no signs of struggle. It's very difficult to understand what it was that was supposed to put the defendants on notice of the onset of an emergency. That's tied into the standard of care that the defendants are under, and because they're innkeepers, they're under a heightened standard of care to look after the guests. They have to observe something. So even if you had a lifeguard right there, and I fully appreciate that that's not your position, but even if they had a lifeguard right there and there were people around the pool, you have to be able to perceive that there's an emergency ongoing before they respond. And it seems to me that there weren't, just the way it played out here, it looks to me like there were not obvious signs of struggle. Well, according to Dworkin and our security expert, Leakin, had somebody been scanning the pool or observing the monitor, he or she would have observed that somebody who swam one lap and took another one sank underwater and did not come up. And that was the critical time that was lost. So at what point after this individual, is there testimony about how long he was under before a reasonable security system should have detected that he was in distress? A reasonable security system should have detected that he was underwater promptly. And there was no specific reference to two and a half minutes or one minute, 20 seconds. But Dr. Roscoe says you've only got a minute to get him out. That's right. And that's why if we follow Dworkin's testimony, that ANSI, that applies to resorts with swimming pools, requires the 10-20 rule. Which means within 20 seconds... What you've said before was if they had been prompt, they would have been there within two minutes because you put together various pieces of testimony. But if one minute is the limit for having saved him, where's the causation? Well, the causation is that there was no apparatus in place that enabled any employee, anyone on behalf of the hotel or the swimming pool operators, to pick up that distress within a minute or 30 seconds or 10-20 or even under two minutes. It simply did not happen. There was no struggling. If every time somebody goes underwater, is the hotel security obligated to send somebody out? They're not. But when somebody's underwater for 30 seconds or for 40 seconds, under the 10-20 observation rule, that person would pick that up. And that's essentially... Wait. You've muddled two things. At least you've muddled two things in my head. What you told me the 10-20 standard was, was that they are required to be able to observe every 10 to 20 seconds what's going on at the pool. That means that they should be looking at a monitor that monitors the pool about three times a minute. That didn't say anything about what the ANSI standard is for response time. Is there an ANSI standard for response time? The ANSI standard does not build in a response time... So I think the answer to my question is no. There is no ANSI standard that prescribes a response time to a resort. So now we're down to the question of what's a reasonable time if they saw something, and what is it that they have to see in order to trigger a duty on their part to respond? The reason we get beyond that is because nobody on behalf of the pool operator or the hotel picked up that fact. Picked up what fact? The fact that Mr. Plonk was drowning. But there was no struggle there. There was nothing. He was underwater. Nobody around the pool picked up on it. He was missing for a very substantial time. How are they supposed to know that he's missing? But precisely by observing the pool deck because it is a dangerous instrumentality. Wait a minute. They're supposed to be monitoring everybody on the pool deck and counting noses every 20 seconds? That's what the ANSI standard calls for. Counsel, that's ridiculous. I apologize. It's silly. That's really not what that standard says, is it? It doesn't say exactly that. Okay. Well, if it doesn't exactly say that, what does it exactly say? When you're scanning 10 to 20 and you pick up somebody being underwater for a prolonged period of time, you sink them out. You get them out of the water, not at 4 minutes 35 seconds when the laypeople did that, and you don't apply CPR at 8 minutes, but you do it within a minute, a minute and a half, a minute 10 seconds when somebody can be salvaged. And all the cases that deal with... A minute and 10 seconds from what? A minute and 10 seconds from the time that he was observed as being underwater. Counsel, are they obligated to send somebody out to the pool every time they see somebody go underwater? People swim underwater all the time. They're diving for things, they've dropped a mask, the kids are playing with things, they're racing across the pool underwater. What's the obligation? Your Honor, we're not dealing with a case where we have 50 people diving in and out. Right. We're dealing with a pristine pool where one person took a lap, then came back and took a second lap and sank and never resurfaced. That is an observable fact that is completely unlike multiple people in the water bopping in and out. That's a different reality. Did you have testimony about, figuratively speaking, somebody starting a stopwatch when the decedent went under the water? Was there testimony in the record to say at this point it should have been obvious that there was an emergency? There was no testimony to that effect. Because it seems to me your much stronger argument is their response time. And the response time has to be anchored to the onset of an emergency. And I don't know how to anchor that here, hence my problem with your causation argument. To your question, Judge Christian, both Mr. Leakin and Mr. Dworkin testified that had they been actively monitoring, the employees would have picked up the fact that Mr. Kwok went underwater. When? At some point within the first two minutes. But here's the problem. Your expert said they only had one minute, about one minute to get him out. Well, that's Dr. Rossi who I believe said a minute is critical. But he did say even after a minute somebody could be saved. The question is to what extent has he or she been damaged internally. And the reason we know that that fact pattern doesn't play out is because Mr. Kwok was underwater for over four minutes. We can't undo that because Mr. Kwok was allowed to be submerged for a prolonged period of time that the hotel operators should have avoided. Counsel, how big was the pool? It's almost Olympic size. Okay. And how many people were in the area at the time? What time of day was it? It was about four o'clock in the afternoon and there were barely a handful of people. Handful of people. How many? Possibly two to four. Two to four. We know there were four when the commotion occurred. But other than Mr. Kwok's companion teacher, there's another teacher who was on sabbatical with him. He was in the hot tub which was onto a side. When he got out and looked for his friend, where did my friend go, that he saw a body simply floating at the bottom of the pool. And two people who turned out to be neighbors upstairs jumped in and fished him out. That's exactly what the hotel operators should have done in the first intervening moments. The minute he sank and was not responding, he was not swimming, they should have taken some measure of protection. The reason they didn't do it is not because Mr. Kwok was not moving. It's because there was no system in place. Is that the trigger? Now you're saying something a little bit different. I think it's established that there was no obvious sign of duress, no struggle, when the decedent sank below the surface. But is it the observation that he was below the surface and not moving? I think that's the fact. So when did that happen? There are police reports, emergency reports filed by the witnesses and by the companion teacher. And they all said that he was not moving, he was simply floating. But when? They observed it late in the game. Way over four minutes. Well, that's Judge Kristen's question and one of my questions as well. When was it that he stopped moving? Do we even know? We don't know that because we cannot know that. The only way we would know that is if somebody was observing. Had somebody been observing, well, we saw that he went under a minute, 30 seconds ago and he seemed to be swimming. We don't have that. And nobody was looking at the pool, so we don't know whether he stopped swimming within 30 seconds or four minutes, 10 seconds or thereafter. We do know that when he was brought out, he was alive. He was brain dead effectively and therefore three days later when Mrs. John came to the site, to the hospital, she agreed with the doctors to stop the respirator, but he was not dead. So whatever incident occurred, whether it was cardiac, whether it was drowning, whether it was lack of energy, that occurred at a time that we don't know and the reason we don't know that... Maybe I'm missing it, but there's a video that allowed you to determine that he was underwater for two minutes and 16 seconds. Only in terms of time, Your Honor. I'm sorry? Only in terms of time. We don't see very much in the video. It's murky. So that's my question, if you could just close this loop for me. Is it the problem that the quality of the film is so poor that you can't tell at what point he was underwater, both submerged and not moving? Is that it? You can't discern that? We know that he went in at this end of the pool, at the end of the pool where the camera is. And then once he dives in, we don't see him and it's completely pristine. But you can't tell, it sounds like you don't have the degree of resolution that would allow an observer to know that he was below water and not moving. Is that it? That's correct. Okay, thank you. Thank you, Counsel. We don't know that issue. Right. And that's not an issue that we should be charged with proving because we can never prove that. Counsel, your time has expired. We'll give you a minute for rebuttal when the time comes. Thank you very much. It please the Court, Archie Ikehara for Defendant Appellee Cross Appellant 445 Seaside. The District Court properly granted the motion for judgment as a matter of law in favor of Aqua Hotels and 445 Seaside because there was a failure, absolute absence of evidence on causation. It was plaintiff's burden to prove not only liability or negligence, but also causation before you get to damages. In the Rule 50 ruling, there's the mention at ER 1062 about the lack of observation of struggling. And at ER 54, the judge makes a mention of not having evidence of this issue that we've just been discussing about the response time. But the bulk of her ruling isn't focused on that. I'm sorry? The bulk of her ruling isn't focused on that. What I'm trying to get at is, I'm not sure if you're going to back up and talk about the Daubert issue or not, but the bulk of her ruling, it just makes sort of a glancing blow at this point. She covered, when the motion was made, it was not just argument by counsel and she ruled. There was an extensive exchange between the attorneys regarding this issue of causation. She talked about the lack of emergency phone at the poolside, AED, lifeline, warning signs not in Korean language, a CCTV system, the lack of a pool attendant. And there was no evidence introduced by plaintiffs that any such deficiency, even if it was a breach, caused Mr. Kwok's death. There were nine people in the pool at the time he went under. That's according to plaintiff's own expert, Gerald Dworkin. Nine people, 18 eyes, none of them seen him go under. He did not struggle, he simply sank to the bottom of the pool. How big was this pool? It was almost Olympic size. Striped on the bottom? No, it was not that big. A separate float line to give swimmers a respite from other people playing in the pool? No, there was nothing like that. And neither was it required by any type of statute or rule of regulation by the state of Hawaii or the city of Honolulu. But part of the judge's problem is that there was this really difficult time trying to pin down how long is too long. Right. And she made that clear at ER 73. She said, quote, if there were any evidence it would have been better, had help come sooner, such that the jury was not going to be purely speculating, I would have let this go to the jury. And so it's a little tough to tease this out because Dr. Rossi's testimony on liability was excluded in its entirety, right? Well, he could testify on damages, but not on liability. Correct. Right. He was excluded on liability. And part of his liability testimony that plaintiffs couldn't introduce was his testimony that if this individual had been extracted within about a minute, then it's possible that he could have been removed without suffering any neurological damage. Is that right? Correct. Okay. So it seems to me you have a very strong case that if Dr. Rossi's testimony is excluded, plaintiffs just pretty much can't prevail, can't put on a prima facie case of failure to rescue theory. Correct, because you need the causal link. And the difficulty with Dr. Rossi, I think he was being candid with the court, he stated, quote, I cannot state with probability, your honor, and I have not, that an AED would probably have allowed this man to survive and avoid death or avoid severe neurological disability. Right, but that's the AED theory. Correct. In terms of the other issue regarding liability, he could not tell at what point Mr. Kwok's heart stopped beating. He stated a cardiac event occurred at some point. However, he could not tell when that occurred. He could not exclude the possibility that there was an initial cardiac event. But does it matter why he went below the surface? For one of their theories it did, but their other theory is simply the failure to rescue theory. And for that it seems to me it doesn't matter whether the decedent had a heart attack or not. In terms of being able to rescue someone, if he has any type of cardiac murmur rhythm, in terms of the AED issue, it would make a lot of difference. Right, but they have a much broader theory than AED. Right. In terms of failure to rescue, there is no law or requirement that you have to have a lifeguard at the pool. Yes, they've conceded that point. Right. And they're saying that you should have had some kind of pool attendant there. They didn't really get into the qualifications. If your life expectancy underwater is about a minute, that's what Dr. Rossi seemed to say, at least that's the length of time a person could stay under without suffering some brain damage, then it seems to me that an adequate pool response system has to get you out of the water within a minute. Otherwise you're just retrieving a damaged or deceased person, right? Right. The problem was there was no struggle. No one, even those people that were in the pool, nine people, didn't seem to go under. Right. So that gets to the other point that we discussed pretty thoroughly with opposing counsel, which seems to be a much tougher problem, that in this particular tragic case there wasn't a sign of struggle. So there has to be an onset of an emergency before we start to stopwatch on adequate response time, right? Correct. Okay, and so his response is that what these folks, defendants, were doing was using a video camera that was pretty grainy, pretty poor, lots of little images, one of those split screens with a lot of little images, and so they couldn't see that he was in distress. Yep. And the Judge Maui talked about that, and what she indicated was that there was nothing in terms of the CCTV system. The minute Mr. Freeman saw that there was a bunch of people gathered at the edge of the pool,  there was no evidence that had Mr. Freeman been staring at the image of the pool 100% of the time, he would have realized that Mr. Kwok was drowning. Regardless of how clear or unclear, if there's no indication that there's anything going on in the pool where he's sitting at his monitor, that would give Mr. Freeman any notice that there's something wrong going on. That only suggests to me that the Plaintiff's Counsel may have a better argument than I realized about how bad the monitor was, how inadequate it was. It seems to me your stronger argument is that the people next to the pool couldn't see that he was struggling, hence you get back to the lifeguard argument. Right, and in terms of the people that were at the pool, no one seen him go under. He did not, he was not under for four minutes. It was about two minutes, 15 or 16 seconds when he submerged and then he got pulled out. As soon as his friend realized that he was underwater, he was pulled out. CPR was started with bystanders. Eventually a security guard came. Unfortunately, they could not bring this man. It sounds like for this kind of a situation, if somebody went underwater and wasn't thrashing around, his argument is it's the absence of thrashing that's a problem. He slipped below the water and wasn't moving, so anybody right there, once they noticed, would see that this person was in distress. He can't be underwater without moving for an extended period of time. But it sounds to me like, if I'm understanding the representations correctly, that the monitor, the person monitoring the pool via the video screen, could never have detected that over the video screen. Well, if there was no struggle, I think Yarn is correct. It would be very difficult, practically impossible, to see a person who is simply, if there's no activity going on, actually going underwater. Very difficult. In terms of, again, the issue regarding the people in the pool, they didn't see it, there was no notice given such that this man, Mr. Kwok, was in danger. If there was evidence that could link that had he been rescued, taken out of the pool between a certain amount of time and efforts made to revive him, there was no evidence to show causation that any negligent conduct on the part of the defendants caused his death. If there was, as the judge indicated, she would have given it to the jury. But there wasn't. And that was what she was struggling with. And she went over the evidence, and she couldn't find that link, that causal link between negligent conduct and damages. The other issue that counsel just mentioned was paragraph 17 in terms of the motion to amend. There were the allegations in the complaint that Mr. Kwok suffered an impairment and a cardiac arrest in three complaints, the initial complaint, the amended complaint, and the third amended complaint. And in those last two complaints, they went even further and stated that he had an impairment  This was from the time of the initial complaint, amended complaint, third amended complaint, and at trial they tried to take that allegation or statement back. The difficulty is I appreciate that the court wanted to hold him to Dr. Rossi's earlier opinion, right? That something happened as opposed to saying that he just drowned. But the order was to strike all of Dr. Rossi's liability testimony. And Dr. Rossi didn't need to testify about the cause of death in order to testify that, which seems to me critical to plaintiff's case, that they only had a minute to get him out before there would be a neurological injury. The problem with Dr. Rossi's testimony, it was just on possibilities, not probabilities. He said probable. I believe it's probable he would have been revived. He said that at ER 183. Your Honor, in terms of what he indicated was that he could not say that had they retrieved him, in terms of any type of minute or second accounting, he couldn't say that. All he said was promptly. Well, no, no, no. There's the deposition testimony and then there's the Dalbert hearing testimony. And at the Dalbert hearing he said, I believe it's probable he would have been, within a minute. He said he had to be extracted within a minute. I believe it's probable that he would have been revived. Yes, he did say that at the Dalbert hearing. And defense counsel objected and said, hey, that's not what he said at his deposition. That's in the record. And the judge made a comment to the effect of, well, I'm not going to allow that, as though there had been an earlier ruling. And am I missing an earlier ruling where she had limited his testimony perhaps to his report or to his deposition testimony? I had a hard time figuring out what she was referring to there. Well, she did rule that he could not testify as to liability based on the two motions in limine. He did testify. No, this is at the Dalbert hearing she made this comment. Okay. She hadn't ruled that way yet. At the Dalbert hearing she made this comment. You know, I don't quite recall that. I know she ruled on the AD issue before recess and in the afternoon we came back and we argued whether or not he could testify as to liability. He was talking about, yes, if they could have reached him within a minute and maybe that would have helped him. But other than that, he couldn't really say specifically in terms of whether or not anything, I'm sorry, she talked about a minute, he talked about a minute and also a longer time, but he really couldn't pinpoint and state specifically that this man would have been saved because there was no evidence. He really wouldn't go so far as to say that he would have avoided death or neurological injury at some point more than a minute. He wasn't comfortable saying that. And in this case there was no evidence that he would have been recognized as being in trouble within a minute. A minute of being recognized that he was in trouble is basically what I wanted to point out. I also have counsel who will be talking about the other issue concerning. There isn't time. We didn't set the clock separately for the two of you and you have one minute left. Thank you, Your Honor. May it please the Court, my name is Kelvin Kaneshiro and I'm appearing on behalf of the Appellee Association of Apartment Owners. Let's go to specific questions. I'd just like to follow up on a couple of things that Mr. Ikehara brought up and what Judge Christin and what Judge Bybee said. First of all, as to Judge Christin's question about Dr. Rossi's testimony about one minute and as to why he couldn't testify before, I believe during the motion to eliminate, the Court had ruled that all experts would be allowed to testify only as to opinions given in their reports of the deposition. So that was the question before the Court. Do you have the citation for that? Sorry, I don't. It was part of that motion to eliminate. But aside from that, even if we assume that what Dr. Rossi testified to about one minute, the next question becomes, even if Mr. Kwok had been pulled out in one minute, what life-saving measures were there that would have caused his recovery? Dr. Rossi never talked about that. The only other things that would have been available to whoever was there after they pulled him out of the pool was what was available at the time of the actual incident, CPR. Plaintiffs argued, well, if he had an AED present, it could have helped. But Dr. Rossi dispelled that completely because he said the AED only works in two particular types of situations. If there's fibrillation ventricular or atrial fibrillation. If there's no heartbeat, it doesn't work. In the facts of this case, we don't know what condition Mr. Kwok would have been had he been pulled out one minute later. And that's the key to paragraph 17 of the complaint. Because if, in fact, Mr. Kwok went under because of a heart condition, then the next question is, what was that heart condition and could that heart condition have been remedied by the AED or by CPR? That's not in the evidence. That's not in Dr. Rossi's testimony. That's not in the evidence. So even if you take Dr. Rossi's testimony about he probably could have been saved if he was brought up within one minute of his submersion, there's still the question of what could have been done to save him. That was the key causation issue that wasn't proven by evidence or by even Dr. Rossi. Now, if we look at also the idea that your honors have raised, what was the emergency that would have triggered somebody's mind, even if they were looking at the pool, to pull Mr. Kwok out? And I think Judge Bybee makes an interesting observation. People go into pools all the time. They go underwater. They're diving all over the place. People don't pay attention to people under the pool, under the water, for certain periods of time because people do that all the time. And in this particular case, I believe under the facts, there was a mother and her two kids who were no more than maybe a quarter of the pool length away from Mr. Kwok. They didn't see anything. They didn't care. Nothing bothered them about Mr. Kwok. Counselor, you've exceeded your time. Thank you, Your Honor. I appreciate it. We'll give you two minutes for rebuttal. The reason why we don't rely on laypeople by the poolside to see what's going on and to observe for safety purposes is because they're busy with their own activities. A mother with two kids would have no possibility of looking at the pool. Counselor, you exceeded. They didn't need to have a lifeguard. We did, but as an alternative to that, and this is what Judge Bybee was inquiring into, what other substitute mechanisms should have existed? And when I was talking about the 10-20 rule, I want to clarify the fact that the 20 portion of the 10-20 rule is to react. You observe for 10 seconds, and if something looks awry, you react and you have 20 seconds to react. And if they had that system... So the 10 seconds is that they have to check every 10 seconds? They have to look at every 10 seconds, and this is why even though there's no lifeguard, if there was a towel attendant... And that's the ANSI standard. That's correct, Your Honor. And what do you mean by react within 20? Does that mean leave the monitoring station to get to the pool? Be at the pool and see what's going on. If the person is in distress, maybe... Excuse me. Let me ask the question. Is it your understanding of the rule that within 20 seconds, they have to be from the monitoring station to the location of the problem? No. Dworkin testified that that person should be there at the pool side and not roaming around. No. Please just answer the question I'm asking. I'm trying to understand, because you're saying something completely different now about the 10-20 rule than you said earlier. So I want to understand your position. Earlier you said that an observation had to be made every 10 to 20 seconds. Now you're saying the observation has to be within every 10 seconds, and then from the moment of observation of a problem, the person has to be on site within 20 additional seconds. I'm not saying that. I think I clarified one portion of my prior discussion, which is the 10-20 rule requires by the end of the 20th second somebody who is on scene already taking action because the person is not reacting. That's different from what I understood you to say just a minute ago. This is quite different from what you said earlier, but now this is quite different from what I understood. So I understood you to say that they're supposed to be monitoring this thing every 10 seconds. So six times a minute they're supposed to be looking at this screen. And if they see something amiss, they're supposed to react within 20 seconds. They're supposed to call for help. I thought that's what you said just a minute ago. That is what I said, Judge. Okay, now that doesn't tell us how long you have to get from either the station to the pool or to get somebody else from someplace else to the pool. Because Your Honor's question assumes that the person monitoring that 10-20 is at a different place. Dworkin testified that person had to be poolside. Then the camera has to be poolside. The guy has to be standing there looking at the camera with the pool in front of him. Right, but we don't have that. The ANSI standard says that? The ANSI standard says somebody should be observing the pool. Okay, observing the pool is observing the pool. If you're observing it on a camera, it presumes that you are not poolside because it would be silly for somebody to be poolside and looking at a camera that's watching the pool. Well, the reason we say somebody had to be poolside is because Mr. Dworkin testified that all aquatic activity is inherently dangerous on site and therefore somebody has to be there, especially at a hotel, a resort. Okay, that's a completely different statement than you made earlier because I started out by asking you whether you felt that there had to be, whether your position was that there had to be a lifeguard or attendant on site or whether monitoring was sufficient. And you answered monitoring is sufficient. And that is how I've understood your position in the briefs also. So, you know, you keep changing your answer and it's very frustrating because we can't figure out what your position actually is or what the testimony actually is that you're relying on. If I could just take the panel back to Judge Mowley's summary judgment decision, JA 1536 forward. She says what the hotelier's, the innkeeper's liability or responsibility is. She says, whether any of the two parties breached a duty of ordinary care or a duty to take reasonable action to protect guests from unreasonable risks of physical harm under the particular circumstances of the case requires facts for the jury to decide. The jury had what she described as a constellation of facts. She decided to extract the case from the jury by dicing and chopping to minutia. But counsel, you know, you can't expect to go to a jury if you don't have the elements, some evidence of each element of your case. And if there is no evidence of causation from which a reasonable jury rationally could get there, then it's proper to do what this judge did. And so we're asking these questions about causation. If I could just quote to a 1954 case, Carrera v. Territory, it's a Supreme Court Hawaii case. Proprietors of bathing resorts are under a duty to supervise or even rescue someone in an apparent danger. We understand that, counsel, but you have to have the facts in your case, not the generalities. We know what the general principles are, but that doesn't get everybody to a jury in every case if the facts aren't there. The facts that are in our case is that there was no monitoring. We don't know whether Mr. Kwok was struggling underwater or not. All we know was what was visible in the dark and dingy lens of a 14-inch monitor which had 12 to 14 tiny, tiny video feeds from which nobody observed anything. Thank you, counsel. We appreciate the arguments of all three of you and the cases argued and the number 14-15736 also was submitted on the briefs at this time.
judges: Graber, Bybee, Christen